IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| HOMESITE INSURANCE COMPANY OF THE MIDWEST, | CV 20–00024–M–DLC |
| Plaintiff, | |
| vs. | ORDER |
| KEVIN R. FROST and SHERRI FROST, | |
| Defendants. | |

Before the Court is Plaintiff Homesite Insurance Company of the Midwest's ("Homesite") Motion for Summary Judgment. (Doc. 18.) Homesite moves for summary judgment on its claim against Defendant Kevin R. Frost ("Mr. Frost") seeking declarations that: (1) the insurance policy at issue does not provide for a defense or coverage for the claims asserted by Sherri Frost ("Ms. Frost") against Mr. Frost in a civil lawsuit filed on February 2, 2018 ("the Underlying Lawsuit"); and (2) Homesite is entitled to recoup its fees and costs incurred in the defense of Mr. Frost in the Underlying Lawsuit. (*Id.* at 2.) For the reasons stated herein, Homesite's motion is granted. Additionally, because this Order resolves Homesite's claims against Mr. Frost, the Court grants Homesite's Motion for Entry of Default Judgment against Ms. Frost. (Docs. 10, 15.)

1

## BACKGROUND

The following facts are undisputed.[1]  Prior to the events giving rise to this

proceeding, Mr. Frost and Ms. Frost were involved in a contested dissolution of

marriage proceeding.  (Doc. 20-5 at 1.)  On the morning of February 9, 2016, while

these dissolution proceedings remained ongoing, Mr. Frost engaged in a series of

acts against Ms. Frost that formed the basis of several criminal charges.  (*Id.* at 1–

2.)  During these criminal proceedings, Mr. Frost pled guilty to one count of

Aggravated Kidnapping in violation of Montana Code Annotated § 45-5-303 and

one count of Partner Family Member Assault in violation of Montana Code

Annotated § 45-5-206.  (Doc. 20-4 at 3–4.)

At the plea hearing, Mr. Frost admitted on the record that on February 9,

2016, he "purposely and knowingly" restrained Ms. Frost "by holding her in a

place of isolation and forcing her into [his] vehicle, causing her great apprehension

of serious bodily injury and an extreme amount of stress."  (*Id.* at 5–6.)  Mr. Frost

further admitted that "during this process [he] actually physically grabbed [Ms.

Frost]" and twisted her arm in the process of placing her in his vehicle.  (*Id.* at 6.)

For these offenses, Mr. Frost was sentenced to, *inter alia*, a term of 30 years with

---

[1] The Court notes at the outset that in accordance with Local Rule 56.1(a) Homesite filed a
Statement of Undisputed Facts along with its motion.  (Doc. 20.)  Despite being provided with a
notice in accordance with Local Rule 56.2 warning Mr. Frost that he was required to file a
Statement of Disputed Facts, Mr. Frost failed to do so.  (Doc. 21.)  As such, Mr. Frost's failure to
file a Statement of Disputed Facts is "deemed an admission that no material facts are in dispute."
L.R. 56.1(d).

the Montana Department of Corrections with 25 years suspended.  (Doc. 20-5 at

3.)  As of the date of this order, Mr. Frost remains incarcerated.

In the wake of Mr. Frost's criminal proceeding, Ms. Frost initiated the

Underlying Lawsuit against him and others stemming from the February 9, 2016

incident.  (*See generally* Doc. 20-1.)  In the Underlying Lawsuit, Ms. Frost asserts

nine claims against Mr. Frost, including: (1) negligence; (2) false imprisonment;

(3) assault; (4) battery; (5) negligent infliction of emotional distress; (6) intentional

infliction of emotional distress; (7) actual malice; (8) gross negligence; and (9)

destruction of or tampering with a communication device.  (Doc. 20-1 at 28–33.)[2]

In addition, Ms. Frost seeks an award of punitive damages.  (*Id.* at 33.)

Notably, these claims are entirely based on Mr. Frost's actions on February

9, 2016.  (*Id.* at 4–8, 28–33.)  Specifically, Ms. Frost contends that, on February 9,

2016, Mr. Frost took control of her vehicle and "transported her against her will",

before physically removing her and transferring her to another vehicle.  (*Id.* at 4.)

Ms. Frost alleges that Mr. Frost intentionally restrained, kidnapped, and

imprisoned her, while also "damaging, destroying, and/or withholding" her cell

phone in order to prevent her from contacting "emergency officials."  (*Id.* at 29,

---

[2] Homesite maintains that Ms. Frost has leveled only five claims against Mr. Frost in the
Underlying Lawsuit, including false imprisonment, assault, battery, intentional infliction of
emotional distress, and negligence.  (Doc. 19 at 2.)  But this assertion is contradicted by the very
complaint Homesite attaches to its Statement of Undisputed Facts.  (Doc. 20-1 at 28–33.)

31–33.)

After being made aware of, but prior to formal service of the Underlying

Lawsuit, Mr. Frost tendered a claim to his insurer, Homesite, seeking defense and

indemnity under a homeowner's policy issued by 21st Century Insurance and

underwritten by Homesite ("the Policy").  (Doc. 20-6 at 2; *see also* Doc. 20-8.)  On

October 11, 2018, Homesite sent Mr. Frost a letter notifying him that it was

tendering a defense as to the Underlying Lawsuit subject to a complete reservation

of rights.  (Doc. 20-7 at 2.)  This included explicit reservation of the right "to

recoup defense fees and costs incurred . . . should a court determine that no

coverage exists under the policy."  (*Id.*).  Additionally, Homesite explained its

position that coverage was not available under the Policy because: (1) the actions

giving rise to a claim did not fall within the meaning of an "occurrence" as defined

by the Policy; and (2) coverage was precluded under applicable law and several of

the Policy's exclusionary provisions.  (*Id.* at 2–6.)

The Policy lists Mr. Frost as a named insured and provides property damage

coverage for a property located in Corvallis, Montana.  (Doc. 20-8 at 4.)

Additionally, the Policy provides Mr. Frost with $500,000 in personal liability

coverage for claims made or suits brought against himself "because of a 'bodily

injury' . . . caused by an 'occurrence' to which this coverage applies."  (Doc. 20-8

at 1, 4, 33.)  Additionally, the Policy obligates Homesite to provide Mr. Frost with

4

a defense against such claims.  (*Id.* at 33.)  The Policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions which results, during the policy period, in" bodily injury.  (*Id.* at 23.)  The Policy specifically excludes from personal liability coverage "bodily injury . . . [w]hich is expected or intended by the insured" or that arises out of the use of a motor vehicle.  (*Id.* at 34.)  The Policy does not provide for coverage in the event of an award of punitive damages.

Mr. Frost subsequently accepted the defense offered by Homesite.  (Doc. 20-6 at 2.)  After Homesite procured defense counsel for Mr. Frost, an answer to Ms. Frost's complaint was filed.  (*Id.* at 3; *see generally* Doc. 20-3.)  In his answer, Mr. Frost admits that on February 9, 2016 he "took control of [Ms. Frost's] vehicle and transported her against her will" to another vehicle.  (Doc. 20-3 at 4.)  Additionally, Mr. Frost admits he "detained and/or restrained [Ms. Frost] in a motor vehicle."  (*Id.* at 21.)  Homesite subsequently filed this lawsuit against Mr. Frost and Ms. Frost, seeking declarations from this Court that: (1) the Policy afforded Mr. Frost no coverage for the claims asserted by Ms. Frost; and (2) Homesite is entitled to recoup the fees and costs incurred in defending Mr. Frost against Ms. Frost's lawsuit.  (Doc. 1.)

## STANDARD

Homesite is entitled to summary judgment if it can demonstrate "that there is

no genuine issue as to any material fact and [it] is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(a).  Material facts are those which may affect the

outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A dispute as to a material fact is genuine if there is sufficient evidence for a

reasonable fact-finder to return a verdict for the nonmoving party. *Id.*  If the

moving party meets its initial responsibility, the burden then shifts to the opposing

party to establish that a genuine issue of fact exists. *Matsushita Elec. Indus. Co. v.*

*Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In meeting this burden, conclusory

assertions are insufficient, and "non-speculative evidence of specific facts" is

required. *Cafasso v. General Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th

Cir. 2011).

## DISCUSSION

## I.    Homesite's Motion for Summary Judgment

Because this Court is exercising diversity jurisdiction, the law of Montana

applies. *Stanford Ranch, Inc. v. Maryland Cas. Co.*, 89 F.3d 618, 624 (9th Cir.

1996).  This renders Montana's choice of law rules binding on the Court. *Johnson*

*v. Wells Fargo Home Mortg., Inc.*, 635 F.3d 401, 420 n.16 (9th Cir. 2011).  In the

absence of a choice of law provision within an insurance contract, this Court

applies Montana Code Annotated § 28-3-102 to determine what law governs the

contract's interpretation. *Tidyman's Mgmt. Servs. Inc. v. Davis*, 330 P.3d 1139,

1149 (Mont. 2014).  Under this statute, an insurance contract is "to be interpreted according to the law and usage of the place it is to be performed or, if it does not indicate a place of performance, according to the law and usage of the place where it is made."  Mont. Code Ann. § 28-3-102.  Thus, which state's law governs the interpretation of the Policy depends on its anticipated places of performance, and, if none, the state in which the Policy was made.

The Parties seemingly presume that Montana's substantive law governs the interpretation of the Policy.  Homesite asserts that because the Policy was "issued for delivery" in Montana and the underlying torts complained of by Ms. Frost occurred in this State, Montana substantive law governs this dispute.  (Doc. 19 at 10.)  Mr. Frost provides no contrary argument.  (Doc. 22.)  But, as noted above, the law governing the interpretation of the Policy depends not on the place of its issuance or the locality of any underlying torts, but rather on its anticipated place of performance or, as a last resort, the place in which it was made.

The Policy provides a variety of coverages, including: (1) $355,000 in coverage for damages sustained to a dwelling located in Corvallis, Montana; (2) $35,500 in coverage for damages to "other structures" contained on the real property located in Corvallis, Montana; (3) $177,500 in coverage for damages caused to Mr. Frost's personal property while he is "anywhere in the world"; (4) $71,000 in coverage for loss of use of the dwelling located in Corvallis, Montana;

and (5) $500,000 in personal liability coverage for covered suits brought against Mr. Frost.  (Doc. 20-8 at 4.)  The Policy contains no choice of law provision, nor does its terms purport to limit the geographical scope of coverage.

Indeed, the Policy insures real property located within Montana and provides Mr. Frost with property damage and personal liability coverage for claims arising anywhere in the world, including Montana.  As such, this Court concludes that Montana is an anticipated place of performance under the Policy.  Mont. Code Ann. § 28-3-102; *Mitchell v. State Farm Ins. Co.*, 68 P.3d 703, 709 (Mont. 2003) (holding "the place of performance is also the place where an insured is entitled to receive benefits . . . .").  This conclusion is underscored by the fact that events giving rise to the Underlying Suit occurred in Montana and Mr. Frost sought to obtain benefits under the Policy here.  Consequently, applying Montana's choice of law principles to the Policy, the Court finds that Montana's substantive law shall govern its interpretation of the relevant provisions.

### A. The Undisputed Material Facts Entitle Homesite to Summary Judgment on the Issue of Coverage for the Events Complained of in the Underlying Lawsuit.

Interpretation of the Policy presents a question of law resolvable by this Court.  *Steadele v. Colony Ins. Co.*, 260 P.3d 145, 149 (Mont. 2011).  In doing so, this Court applies general principles of contract law and construes the Policy "strictly against the insurer and in favor of the insured."  *Id.*  The Policy's terms

8

are interpreted according to "their usual, common sense meaning as viewed from the perspective of a reasonable consumer of insurance products." *Allstate Ins. Co. v. Wagner-Ellsworth*, 188 P.3d 1042, 1046 (Mont. 2008).

In examining the reach of a Policy's coverage, the focus rests on "the acts giving rise to the" claim rather than a complaint's "legal theories or conclusory language." *Town of Geraldine v. Montana Mun. Ins. Auth.*, 198 P.3d 796, 800–01 (Mont. 2008); *see also New Hampshire Ins. Grp. v. Strecker*, 798 P.2d 130, 132 (Mont. 1990).  Accordingly, mere inclusion of a negligence claim in a complaint is insufficient to pull such claims within the scope of coverage.  *Strecker*, 798 P.2d at 132.  Likewise, this Court is mindful not to relegate its interpretative task to a singular determination of whether the acts in question were intentional.  The Montana Supreme Court has held on multiple occasions that intentional acts may nonetheless constitute an "occurrence" under policy language nearly identical to that at issue here.  *See, e.g., Northwest Nat. Cas. Co. v. Phalen*, 597 P.2d 720, 726 (Mont. 1979); *Millers Mut. Ins. Co. v. Strainer*, 663 P.2d 338, 340–42 (Mont. 1983), *abrogated by Sherner v. Conoco, Inc.*, 995 P.2d 990 (Mont. 2000). Thus, whether Mr. Frost's actions were intentional is relevant, but not determinative to this Court's coverage analysis.

Instead, when analyzing whether an action constitutes an "occurrence" within the meaning of personal liability coverage, this Court focuses on whether

9

the acts in question resulted in an "unexpected happening . . . without intention or design on part of the insured." *Safeco Ins. Co. v. Liss*, 16 P.3d 399, 406 (Mont. 2000). This means it is the results of acts, not the acts themselves, that govern whether something is an "occurrence," and thus afforded coverage under a personal liability policy. *Id.* (noting that the intentional "unsafe use or mishandling of firearms are an all too frequent 'occurrence' in" Montana, and nonetheless may remain an "insurable event unless otherwise expressly excluded under an insured's personal liability policy").

Additionally, when an insurance policy contains a personal liability exclusion for acts expected or intended by the insured, Montana law instructs this Court to apply a two-prong test, first inquiring whether the acts in question were intentional before second ascertaining "whether the consequence[s] or resulting harm[s] stemming from the act [were] intended or expected from the actor's standpoint." *Employers Mut. Cas. Co. v. Fisher Builders, Inc.*, 371 P.3d 375, 379 (Mont. 2016). This second inquiry involves an objective determination, thus preventing claimants from pulling their acts within coverage by simple assertion that the resulting harms of which the victim complains were unexpected. *Id.* 379– 80.

Four prior cases have helped delineate the bounds of personal liability coverage under Montana law and are particularly relevant to this case. First, in

1985, the Montana Supreme Court upheld the district court's grant of summary judgment to an insurer on the basis that the intentional punching of another person was not "intended or expected from" the insured's standpoint. *Mutual Serv. Cas. Ins. Co. v. McGehee*, 711 P.2d 386 (Mont. 1985). In so holding, the Court concluded that the "undisputed facts show . . . McGehee . . . intentionally struck appellant in the face" and that "McGehee's insurance policy with respondent does not provide coverage for bodily injuries intended or expected from McGehee's standpoint." *Id.* at 827. The Court likewise found that "it is irrelevant for the purposes of this insurance exclusion that the assailant causes an injury different in character or magnitude from the harm he subjectively intended." *Id.* at 828.

Second, in 1990, the Montana Supreme Court upheld the district court's grant of summary judgment to an insurer on the basis that the insured's intentional sexual abuse of his daughter did not constitute an occurrence, despite his assertion that he did not intend to injure his daughter. *Strecker*, 798 P.2d at 131–32. In so holding, the Court found that the insured "pleaded guilty to three counts of felony sexual assault of a minor" and concluded "it would fly in the face of reason to hold" the insured intended no harm by his actions. *Id.* at 131–32. Additionally, the Court found the insured's "subjective intent to cause harm" irrelevant. *Id.* at 132.

Third, in 1992, the Montana Supreme Court upheld the district court's grant

11

of summary judgment to an insurer on the basis that the insured's deliberate kicking, hitting, and biting of other persons fell within the policy's intended or expected exclusion. *American States Ins. v. Willoughby*, 836 P.2d 37, 41 (1992). Relevant to the Court's analysis was that the insured "pled guilty to three counts of misdemeanor assault" for his actions, thus establishing that such acts were "intentional and not accidental." *Id.* at 40. The Court found the insured's action to be "by their very nature" evidence of an intent to injure, thus placing them within the expected or intended exclusion of the policy. *Id.* at 41.

Finally, in 1994, the Montana Supreme Court found that an insured's hitting of another person in the face fell within the policy's expected or intended act exclusion. *Smith v. State Farm Ins. Cos.*, 870 P.2d 74, 76 (Mont. 1994). The Court found the insured's plea of guilty to misdemeanor assault charges in the wake of the accident compelling evidence of an intentional act. *Id.* at 75–76. Additionally, the Court found that the insured's "conduct of hitting Kinsey with his fist, by its nature, evinces an intent to injure," thus placing outside of the policy's scope of coverage. *Id.* at 76.

Notably, in *McGehee*, *Willoughby*, and *Smith*, the Court additionally expressed its view that permitting coverage to extend to the intentional criminality at issue would likely violate public policy. *McGehee*, 711 P.2d at 828 (collecting authority that "to require coverage in a situation such as the one at bar . . . is a

12

violation of public policy"); *Willoughby*, 836 P.2d at 40 (noting that permitting criminal actions to form the basis of policy coverage would "vitiate[e] the purpose of insurance"); *Smith*, 870 P.2d at 76 (holding that "[p]ublic policy forbids indemnifying willful wrongdoing and there is no insurance coverage for striking someone in the face"). These statements were fortified by the Court later, when it forcefully held "that in Montana there is an unmistakable public policy against . . . indemnification" for criminal acts. *Liss*, 16 P.3d at 405.

Additionally, under Montana law, an insurance policy does not cover an award of punitive damages unless its express terms so provide. Mont. Code Ann. § 33-15-317(1). Because the Policy does not expressly provide for coverage in the event of an award of punitive damages, this claim in the Underlying Lawsuit does not fall within the scope of coverage. Turning to the nine claims leveled against Mr. Frost in the Underlying Lawsuit, it is the opinion of this Court that the undisputed material facts provide for only one conclusion—the Policy does not provide coverage.

In support of its quest for summary judgment, Homesite argues that: (1) the acts which form the basis of the Underlying Complaint do not constitute an "occurrence" within the meaning of the Policy; (2) even if such acts did constitute an "occurrence," applicable law and the Policy's exclusions prohibit coverage. (Doc. 19 at 13–23.) The Court agrees.

13

The acts of which Ms. Frost complains in the Underlying Lawsuit are precisely the intentional acts which gave rise to the criminal charges for which Mr. Frost is currently incarcerated.  Indeed, Mr. Frost plead guilty to charges of Aggravated Kidnapping and Partner Family Member Assault.  (Doc. 20-4 at 3–4; Doc. 20-5 at 2–3.)  In doing so, he admitted to purposely and knowingly restraining Ms. Frost "by holding her in a place of isolation and forcing her into [his] vehicle, causing her great apprehension of serious bodily injury and an extreme amount of stress."  (Doc. 20-4 at 5–6.)  Mr. Frost additionally admitted to grabbing Ms. Frost and twisting her arm.  (*Id.* at 6.)  In short, the undisputed material facts establish that Mr. Frost's actions on February 6, 2016 were intentional.

The Court likewise finds that the resulting harms of which Ms. Frost complains were not accidental, and thus do not form the basis of an "occurrence" within the meaning of the Policy.  Here, as in *Strecker*, the Court concludes "it would fly in the face of reason" to conclude that when Mr. Frost intentionally restrained Ms. Frost, grabbed her, twisted her arm, and forced her into a vehicle, that he did not intend to harm her.  *Strecker*, 798 P.2d at 132.  Nothing about the acts complained of, or the resulting harms to Ms. Frost, were accidental.  As such, they do not constitute an "occurrence" giving rise to personal liability coverage under the Policy.

14

Additionally, this finding of intentionality satisfies the first prong of the test established by Montana law for the application of an "intended or expected" exclusion to personal liability coverage.  Mr. Frost attempts to create a genuine issue of material fact by asserting that he subjectively lacked the intent to cause Ms. Frost physical or emotional harm, arguing instead that any such harm was the result of negligence.  (Doc. 12 at 1.)  But, as noted above, the inquiry is not what Mr. Frost subjectively intended but rather what an objective examination reveals about his intent.

Applying this standard, the Court finds that here, as in *McGehee*, *Strecker*, *Willoughby*, and *Smith*, Mr. Frost's intentional restraining of Ms. Frost, along with his physically grabbing her and twisting her arm to force her into a vehicle objectively reveals an intent to cause the harm of which she now complains in the Underlying Lawsuit.  As such, the Court finds the second prong of the test established by Montana law for the application of an "intended or expected" exclusion to personal liability coverage is satisfied in this case.  Thus, even if the acts complained of constituted an "occurrence," the Policy's exclusion of personal liability coverage for injuries "expected or intended by" Mr. Frost, precludes coverage in this case.

The Court additionally recognizes that, in essence, Mr. Frost seeks to insulate himself from the consequences of his criminal activity through the

Policy's personal liability coverage.  But, as noted above, if the Policy provided Mr. Frost with indemnification for his criminal acts, Montana's public policy would be violated.  *Liss*, 16 P.3d at 405.  In any event, as the Court concludes, the Policy provides no such coverage here.

Because the Court has determined that the acts complained of in the Underlying Lawsuit do not constitute an "occurrence" and that coverage is precluded by the Policy's expected or intended exclusion, it declines to address Homesite's argument that coverage would likewise be precluded under the Policy's automobile exclusion.  (Doc. 24 at 11.)

> **B.    The Undisputed Material Facts Entitle Homesite to Summary Judgment on the Issue of its Duty to Defend Mr. Frost in the Underlying Lawsuit.**

The language of an insurance policy determines whether an insurer has a duty to defend their insured in a specific case.  *Grimsrud v. Hagel*, 119 P.3d 47, 53 (Mont. 2005).  "If there is no coverage under the terms of the policy based on the facts contained in the complaint, there is no duty to defend."  *Id.*  Because this Court has determined that the acts complained of in the Underlying Complaint do not fall within the scope of the Policy's coverage, Homesite has no duty to defend.

> **C.    The Undisputed Material Facts Entitle Homesite to Summary Judgment on the Issue of its Right to Recoup the Amounts Expended in Defending Mr. Frost in the Underlying Lawsuit.**

Under Montana law, an insurer is entitled to recoup costs expended on an

16

insured's behalf for the defense of uncovered claims if it timely and explicitly

reserves its right to recoup such costs.  *Travelers Cas. & Sur. Co. v. Ribi*

*Immunochem Research, Inc.*, 108 P.3d 469, 480 (Mont. 2005).  This is

accomplished by providing the insured with notice prior to the tendering of costs in

support of the defense.  *Id.*  Homesite contends that its has fully complied with

these requirements.  (Doc. 19 at 24–25; Doc. 24 at 11–12.)  Mr. Frost, for his part,

argues against recoupment on the grounds that he provided prompt notice to

Homesite of the claims asserted in the Underlying Lawsuit.  (Doc. 22 at 4.)  Mr.

Frost's argument is unpersuasive, and the Court will grant Homesite summary

judgment on this issue.

The undisputed material facts reveal that after Mr. Frost provided Homesite

with a copy of the Underlying Lawsuit, it responded with precisely the sort of

reservation of rights letter contemplated by *Ribi*.  (Doc. 20-7.).  Indeed, this letter

explicitly notified Mr. Frost that a defense was being tendered subject to

Homesite's reservation of the right "to recoup defense fees and costs incurred . . .

should a court determine that no coverage exists under the policy." (*Id.* at 2.)

With respect to timeliness, Homesite only provided a defense after notifying Mr.

Frost of the reservations attached to the defense.  (*Id.* at 6; Doc. 20-6 at 2–3.)  Mr.

Frost specifically accepted the defense offered by Homesite, subject to the

reservations contained in its letter.  (Doc. 20-6 at 2.)  In short, the undisputed

material facts demonstrate Homesite did exactly what it was supposed to do in order to reserve its right to recoup defense costs expended on Mr. Frost's behalf in the Underlying Lawsuit.  Accordingly, summary judgment on this issue is warranted.

## II.   Homesite's Motion for Entry of Default Judgment

On April 7, 2020 Homesite moved for entry of default judgment as to Ms. Frost.  (Doc. 10.)  This Court reserved ruling on Homesite's motion (Doc. 10) until the claims against Mr. Frost were resolved.  (Doc 15.)  Ultimately, the decision of whether to enter a default judgment under Rule 55(b) of the Federal Rules of Civil Procedure remains within this Court's discretion.  *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980).  In exercising this discretion, this Court considers a variety of factors, including: (1) the possibility of prejudice to the plaintiff; (2) the merits of plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.  *Eitel v. McCool*, 782 F.2d 1470, 1471–72 (9th Cir. 1986).  Upon weighing these factors, the Court finds an entry of default judgment against Ms. Frost appropriate.

The first factor weighs strongly in Homesite's favor.  Because Ms. Frost has

18

failed to answer Homesite's Complaint (Doc. 1) or otherwise appear and defend against this action, the Court's failure to grant Homesite's motion (Doc. 10) would effectively leave it without a remedy. This the Court will not do. With respect to factors two and three, the Court finds their analysis only supports the entry of default judgment against Ms. Frost. Not only is Homesite's complaint (Doc. 1) sufficient to state a claim, but, as analyzed above, its claims are sufficiently meritorious to warrant the grant of summary judgment.

As to the fourth factor—the amount of money at stake—the Court finds that this factor also weighs in Homesite's favor. While Homesite does not seek an award of damages in this action, it does seek absolution from its duty to expend monetary sums in defending Mr. Frost in the Underlying Lawsuit. As noted by Homesite, these expenses continue to accrue, and it intends to recoup these sums from Mr. Frost. As such, given the expenses associated with defending Mr. Frost in the underlying lawsuit, this factor weighs in Homesite's favor.

The fifth and sixth factors—possible factual disputes and excusable neglect—also favor entering default judgment. Because Ms. Frost did not answer Homesite's Complaint, no facts are in dispute. *See PepsiCo, Inc. v. California Sec. Cans*, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002). In addition, as discussed in the foregoing section, the Court finds no disputed material facts precluding the entry of summary judgment in this action. Additionally, because Ms. Frost was

properly served nearly six months ago, it is unlikely that her failure to answer or otherwise appear results from excusable neglect.  (Doc. 4.)

The final factor, the policy favoring a decision on the merits, generally weighs against entering default judgment.  *Eitel*, 782 F.2d at 1472.  Yet "the mere existence of [Rule] 55(b), . . . indicates that this preference, standing alone, is not dispositive."  *PepsiCo, Inc.*, 238 F. Supp. 2d at 1177 (internal quotation marks omitted).  Ms. Frosts' failure to answer or otherwise appear makes any other disposition impractical.  Having weighed each of the factors, the Court finds that default judgment is appropriate.

Accordingly, IT IS ORDERED that Homesite's Motion for Summary Judgment (Doc. 18) is GRANTED.

IT IS FURTHER ORDERED that Homesite's Motion for Entry of Default Judgment (Doc. 10) is GRANTED.

IT IS FURTHER ORDERED that default judgment is entered in favor of Homesite and against Ms. Frost on Homesite's claim for declaratory relief as follows: (1) the Policy does not provide coverage for the claims asserted by Ms. Frost against Mr. Frost in the Underlying Lawsuit; and (2) Homesite is entitled to recoup the fees and costs incurred in defending Mr. Frost in the Underlying Lawsuit.

The clerk of court is directed to enter judgment by separate document and

close the case file.

DATED this 8th day of September, 2020.

Dana L. Christensen, District Judge
United States District Court